UNITED STATES BANKRUPTCY COURT                FOR PUBLICATION
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:

                                                              Chapter 7

The Brown Publishing Company, DPI Liquidation
Inc., Brown Media Holdings Company, Boulder           Case No.: 10-73295-478
Business Information Inc., Brown Business Ledger,
LLC, Brown Publishing Inc., LLC, Business             (Jointly Administered)
Publications, LLC, The Delaware Gazette
Company, SC Biz News, LLC, Texas Community
Newspapers, Inc., Texas Business News, LLC,
Troy Daily News, Inc., Upstate Business News,
LLC, Utah Business Publishers, LLC, ARG,  LLC,


                              Debtors.
----------------------------------------------------------------x
The Brown Publishing Company Liquidating
Trust,
                                                              Adv. Pro. No. 12-8215-478

                              Plaintiff,

                 - against-


Brown Media Corporation,


                              Defendant.
----------------------------------------------------------------x

**MEMORANDUM DECISION AND ORDER**

*Appearances:*

                              K & L Gates, LLP
                           *Counsel for Plaintiff*
                           By: Edward M. Fox, Esq.
                            599 Lexington Avenue
                          New York, New York 10022


                    Meyer Suozzi English & Klein P.C.
                          *Counsel for Defendant*
                       By: Howard B. Kleinberg, Esq.
                       990 Stewart Avenue, Suite 300
                               P.O. Box 9194
                         Garden City, New York 11530


HONORABLE DOROTHY EISENBERG, UNITED STATES BANKRUPTCY JUDGE

Before the Court is the Motion for Summary Judgment filed by Plaintiff, The Brown Publishing Company Liquidating Trust (the "Trust") as successor in interest to the Reorganized Debtors, and the Cross-Motion for Summary Judgment filed by Defendant, Brown Media Corporation ("BMC"), regarding whether there was a breach of contract by the stalking horse bidder and which party is entitled to the good faith deposit made by BMC in connection with its proposed purchase of the Debtors' assets in 2010. The Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and (b). This contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O) and 11 U.S.C. § 363 and New York contract law. The following constitutes the Court's finding of fact and conclusions of law as mandated by Bankruptcy Rule 7052.

## FACTUAL BACKGROUND

The Debtors filed for chapter 11 relief under the Bankruptcy Code on April 30, 2010 and May 1, 2010. Within the year prior to the petition dates, K&L Gates, LLP was retained to assist the Debtors in exploring its restructuring options, and preparing for their bankruptcy filings and to represent them in the bankruptcy cases. Roy Brown was the Debtors' Chief Executive Officer; Joel Dempsey was the Debtors' General Counsel; and B. Joseph Ellingham was the Debtors' Chief Financial Officer. Brown, Dempsey and Ellingham were insiders of the Debtors as defined by 11 U.S.C. § 101(31)(B) (the "Insiders").

As early as February 2010, the Insiders were working with Guggenheim Corporate Funding, LLC and/or one of its affiliates ("Guggenheim") to obtain financing for the purchase of the Debtors' assets for themselves. The Insiders incorporated BMC on March 26, 2010 in order to facilitate the proposed purchase. BMC retained Richard Levy, Esq. of Pryor Cashman LLP on

April 7, 2010 as counsel to represent it in connection with the proposed purchase. On April 16,

2010, BMC obtained a commitment from Guggenheim for $18,000,000 to finance the purchase

of the Debtors' assets (the "Guggenheim Commitment"). The Guggenheim Commitment had an

expiration date of June 2, 2010.

On May 4, 2010, four days after the date of filing of the bankruptcy petitions, the Debtors

filed a motion to sell substantially all of the Debtors' assets free and clear of any interests, claims

or liens to BMC as the stalking horse bidder pursuant to 11 U.S.C. § 363 (the "Motion to Sell").

The asset purchase agreement (the "May 4 APA") provided for a stalking horse bid by BMC of a

cash purchase price of $15.3 million plus additional consideration.  The May 4 APA proposed to

sell not only the personal property and intangibles related to the Debtors' businesses but also 2

parcels of real property located in Xenia, Ohio (the "Xenia Property") and Bellevue, Ohio (the

"Bellevue Property"). The May 4 APA did not allocate a specific purchase price for either the

Xenia or Bellevue Property nor was information given about the value of these real properties.

What became apparent in subsequent hearings was that the Debtors included assets as part of the

sale process that were not itemized in the May 4 APA or disclosed to the Court that may or may

not have been assets of the Debtors, as discussed below.

Even though BMC was relying on the Guggenheim Commitment to finance the purchase

of the Debtors's assets, the May 4 APA specifically contained a representation in  Section 7.4

that provides that:

> Buyer has sufficient funds available to consummate the transactions
> contemplated hereby, and without the conditions to Buyer's obligations
> set forth herein.  THERE IS NO FINANCING CONTINGENCY WITH
> RESPECT TO BUYER'S OBLIGATIONS IN CONNECTION WITH
> THIS TRANSACTION.

2

Even though the May 4 APA did not require BMC to put down a 5% good faith deposit, the Court at a May 20, 2010 hearing on the Motion to Sell, directed that BMC put down a 5% good faith deposit even though it was not required to do so under the May 4 APA.  The Court determined that if other potential bidders were required to put down a 5% good faith deposit in order to be a qualified bidder under the terms and conditions of the proposed sale, then BMC should similarly be required to put down such a deposit as a condition to maintaining its status as a qualified bidder.

On June 28, 2010, the Court entered an order authorizing the Debtors to conduct an auction sale of the Debtors' assets (the "Auction Sale"), and approving the sale procedures annexed to the order ("Sale Procedures") and the form and manner of notice to be provided with respect to the Auction Sale (the "Sale Procedures Order").  Pursuant to Sections F and G of the Sale Procedures, only qualified bidders whose bid is accompanied by, *inter alia,* a cash good faith deposit of 5% of the proposed purchase price, which included BMC, will be eligible to participate in the Auction Sale. In addition, Section M of the Sale Procedures provides that:

> ...if the Successful Purchaser fails to close the Sale, the Successful Purchaser's Good Faith Deposit shall be retained by the Debtors on accounts (sic) of damages suffered by it as a result of such failure to close, without prejudice to the Debtors' ability to seek to recover additional damages from the Successful Purchaser.

The Auction Sale of the Debtors' assets commenced on July 19, 2010 and lasted into the early morning hours of July 20, 2010. A representative of Guggenheim was present at the Auction Sale. Notwithstanding the fact that the Guggenheim Commitment had an expiration date of June 2, 2010, the presence of Guggenheim at the Auction Sale meant that it was still interested in financing BMC's purchase of the Debtors' assets and there is no indication at the

3

time of the Auction Sale that Guggenheim was not going to finance at least part of the purchase.

With the exception of certain assets of the Debtors located in Van Wert, Ada and Putnam, Ohio that were sold to Delphos Herald, Inc. ("Delphos"), BMC was the successful bidder with respect to substantially all of the Debtors's remaining assets after making the highest and best offer for $22,400,000 in cash plus additional consideration.  PNC Bank, N.A., a secured creditor of the Debtors ("PNC"), was the next successful bidder after BMC.

The Court held hearings to approve the Auction Sale of the Debtors' assets to Delphos and BMC on July 22 and 29, 2010 (the "Sale Hearings"). Opposition was raised with respect to, *inter alia*, the Debtors' proposed sale to BMC of the Xenia Property, the Bellevue Property and vacant land located in Urbana, Ohio (the "Urbana Property", together with the Xenia Property and the Bellevue Property, the "Real Properties") to BMC for what appeared to be a below market price. Moreover, the proposed sale of the Urbana Property was not disclosed in the May 4 APA or to the Court yet it was included in the Auction Sale. The Debtors' bankruptcy schedules list the Debtors' interest in the Urbana Property as having a current value of $160,896.42, the Bellevue Property as having a current value of $20,000 and the Xenia Property as having a current value of $374,198.72 as of the petition date.  In particular, the Debtors had exercised an option pursuant to a 2008 agreement and purchased the Xenia Property, which has a commercial building on it, from Roy Brown's parents on March 23, 2010, almost 40 days prior to the petition dates, for $375,000. However, at the Auction Sale, BMC was the only bidder for the Real Properties and placed the winning bid of $10,000 for all three Real Properties.

According to the testimony of Thomas Carlson, the Debtors' independent director and currently the Liquidating Trustee, at the Sale Hearings, no appraisal of the Real Properties were

4

obtained nor were the Real Properties marketed or listed with any real estate broker or listing service for sale. Instead, the Real Properties were included in the Auction Sale without any specific information regarding any of the Real Properties. Mr. Carlson testified that at the Auction Sale, in the last round of bidding around 4:30 a.m. on July 20, BMC agreed to take out the Real Properties from its bid so that the bids by BMC and PNC for the business assets of the Debtors would be more comparable as PNC was not interested in acquiring the Real Properties. After the Auction Sale of the Debtors' businesses had concluded, the Debtors then held a separate auction of the Real Properties only and BMC was the sole bidder for the Real Properties with a bid of $10,000. Even though the asset purchase agreement submitted to the Court for approval on July 23, 2010 provided for the sale of both the Debtors' assets and the Real Properties, the $10,000 bid was made separately from the $22,400,000 winning bid submitted by BMC for the Debtors' businesses. BMC's agreement to purchase the Debtors' businesses at the Auction Sale was not contingent upon its purchase of the Real Properties.

Given the facts and circumstances surrounding the sale of the Real Properties, the Court did not approve the sale of the Real Properties and directed that the Real Properties be taken out of any asset purchase agreement with BMC. The Court noted the purchase price of $10,000 for the three parcels of real estate was not reasonable given that the Real Properties were not adequately advertised and not adequately appraised or evaluated before they were made part of the Auction Sale.

On August 6, 2010, the Debtor and BMC executed an Amended and Restated Asset Purchase Agreement (the "Amended BMC APA") pursuant to which BMC agreed to pay $22,400,000 in cash for the Purchased Assets plus additional consideration. Under the Amended

5

APA, the "Purchased Assets" included, *inter alia*:

> (i) all publications, except certain Ohio publications purchased by Delphos; (ii) all inventories of publications; (iii) all circulation, delivery and mailing lists and carrier routes; . . . (vii) all accounts and other amounts receivables and all other rights to payment, causes of action, claims and rights of recovery arising or accruing prior to the closing date... including those accounts and other amounts receivable set forth in Schedule 2.1.7 to be delivered at closing; (vii) all fixed and tangible personal property, including those items 2.1.8 to be delivered at closing; (viii) all real property leases described in 2.1.9 and all leasehold improvements and fixtures on the premises leased; (ix) all contracts, agreements and leases listed on Schedule 2.1.11(a) and real property leases, along with employment agreements of Joe Ellingham, Roy Brown and Joel Dempsey, provided however, that BMC shall be responsible for cure amounts due with respect to such employment agreements, the employment agreement of Daniel Rattiner with Dan's Papers, Inc., and the consulting agreement with Connie Wimer, provided that the Buyer shall be solely responsible for all cure amounts due and owing with respect to such consulting agreement, but excluding such advertising and other revenue generating agreements relating to the excluded publications purchased by Delphos, and further excluding those contracts, agreements and leases identified in Schedule 2.1.11(b); (x) books and records; . . . and (xxi) all of Sellers' equity interest in, and any claims and causes of action against, North Colorado Business Report, Inc.

The Court approved the Amended BMC APA pursuant to an Order dated August 11, 2010 (the "August 11 Order"). To ensure that the sale of the Debtors' assets did not improperly transfer any undisclosed assets of the Debtors or assets which the Debtors in fact did not own, the Court included the following paragraph ("Paragraph 41") in the August 11 Order:

> 41. The Debtors are authorized to proceed with the Sale pursuant to the terms of the [Amended BMC] APA, but only as to those assets that the Debtors own, and have fully and publicly disclosed in their Bankruptcy Schedules or the APA.

Debtors scheduled the closing on the sale to BMC for August 13, 2010 but closing did not take place on that date. BMC expressed concern to the Debtors' counsel as to whether the Debtors could satisfy the representations and warranties under the Amended BMC APA in light of Paragraph 41 and whether the Amended BMC APA and the Debtors' bankruptcy schedules

adequately disclosed the Purchased Assets sold at the Auction Sale.

On August 17, 2010, the Court held a hearing on the Debtors' request for authority to continue to use PNC's cash collateral beyond August 15, 2010 in order to give the parties additional time to close (the "August 17 Hearing"). The Debtors also sought clarification on Paragraph 41 of the Court's August 11 Order. The Court found that items such as leasehold improvements, machinery and equipment, the accounts receivable were all identifiable assets and the categorical descriptions contained in the Debtors' bankruptcy schedules or the Amended BMC APA sufficiently described the assets being sold to BMC. At the August 17 Hearing, BMC's counsel did not raise any other issue that would prevent or delay closing. BMC did not appeal the Court's August 11 Order nor seek to modify that Order on the grounds that the inclusion of Paragraph 41 was unreasonable or contrary to the terms of the Amended BMC APA nor was any such showing made when the parties sought clarification at the August 17 Hearing. There was an expectation that closing would take place no later than August 20, 2010 and the Court granted the continued use of cash collateral to that date.

However, BMC did not close on the sale of the Debtors' assets after the August 17 Hearing. On August 18, 2010, BMC informed the Debtors that it lost its financing commitment from Guggenheim. BMC sought to obtain backup financing from another source. While there is no evidence of whether BMC obtained a commitment for backup financing, the Court notes that there is no financial contingency provision in the May 4 APA or the Amended BMC APA and the absence of financing would not excuse BMC from closing.

Debtors filed a motion on August 20, 2010 for a hearing on an expedited basis to extend their use of cash collateral until September 3, 2010 in order to allow the Debtors to proceed with

closing on the Auction Sale with PNC, the next successful bidder at the Auction Sale. According to the affidavit filed with the Court, it does not appear that counsel for BMC received notice of the hearing on this request for extension of the use of cash collateral nor did BMC's counsel appear at the hearing held on August 30, 2010. There was no notice of appearance filed on behalf of BMC or any of the insiders of the Debtors that made up BMC at the time.

The Court held a hearing on September 2, 2010 and approved the asset purchase agreements for the sale of the Debtors' assets to PNC's assignee, Ohio Community Media LLC ("Ohio Community Media"), and to ISIS Ventures Partners LLC ("ISIS") pursuant to orders dated September 3, 2010. ISIS agreed to purchase the assets of one of the Debtors, Dan's Papers, for $1,750,000. PNC agreed to pay $21,750,000 for substantially all of the Debtors remaining assets. The combined purchase price was $23,500,000.  The asset purchase agreements with Ohio Community Media and ISIS also contain language identical to Paragraph 41 of the August 11 Order. Closing on the sale to Ohio Community Media and ISIS occurred after the Court approved the asset purchase agreements. In the interim, BMC did not file any motion requesting an extension of time to close on the Amended BMC APA or any opposition to the Debtors' sale of the assets to Ohio Community Media or ISIS.

On March 11, 2011, the deadline for filing requests for payment of administrative expenses incurred in the Debtors' chapter 11 cases, BMC filed a demand requesting the return of its good faith deposit. On June 16, 2011, the Court entered an order confirming the Debtors' chapter 11 plan which provided that any remaining assets of the Debtors' bankruptcy estate that were not sold pursuant to the Auction Sale, including all claims and causes of action, would vest in the Trust.

On May 25, 2012, the Trust commenced this adversary proceeding against BMC for breach of contract and sought a declaratory judgment that the Trust is entitled to retain the $765,000 deposit posted by BMC in connection with its bid to purchase the Debtors' assets. On June 28, 2012, BMC filed an Answer raising various affirmative defenses and a counterclaim for indemnification.

On August 10, 2012, the Trust filed a motion for summary judgment (the "Summary Judgment Motion") seeking a determination that (I) BMC's failure to appear at closing on August 13, 2010 and (ii) BMC's inability to close without the Guggenheim Commitment or any other financing in violation of the no financing contingency representation in the Amended BMC APA, constituted a breach or anticipatory breach. In addition, the Trust seeks a declaratory judgment that the Trust is entitled to keep BMC's good faith deposit together with any accrued interest as liquidated damages as a result of BMC's breach. The Trust also seeks a dismissal of all of BMC's counterclaims for indemnification with prejudice.

On October 1, 2012, BMC filed its cross-motion for summary judgment (the "Cross Motion") asserting that it did not breach the Amended BMC APA because (a) the Debtors were never ready for closing on August 13, 2010, (b) the Debtors terminated the Amended APA first by abandoning BMC and closing on the sale of the Debtors' assets with Ohio Community Media and ISIS, and (3) the Debtors did not sustain any actual damages. Accordingly, BMC argues that the Summary Judgment Motion should be denied and BMC be entitled to the return of its deposit.

The Court held a hearing on the Summary Judgment Motion and the Cross Motion on November 15, 2012 (the "November 15, 2012 Hearing"). It is undisputed that the contract at

issue is the Amended BMC APA dated August 6, 2010.  There are two closing dates discussed by the parties – the anticipated closing date of August 13, 2010, which was extended to sometime after the August 17 Hearing but no later than August 20, 2010.

The issues to be decided are (I) whether BMC breached the Amended APA with respect to the August 13, 2010 closing date or the subsequent closing date, (II) whether the Debtors sustained any damages, if there was a breach, (III) which party is entitled to the good faith deposit, and (IV) whether BMC's counterclaims should be dismissed with prejudice.

<u>DISCUSSION</u>

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7056, the Court may award summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

When no genuine triable issues of material fact exist, the moving party is entitled to judgment as a matter of law and summary judgment should be granted.  *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986).  The mere production of some evidence in support of the opposing party's position will not justify denial of a summary judgment motion, unless the court finds that there is evidence upon which a jury can properly proceed to find a verdict for the party opposing the motion.  *American v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Instead, the opposing party must "set forth specific facts showing that there is a genuine issue for trial."  *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986).  A court must

always "resolve ambiguities and draw reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d at 11.  However, the opposing party may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Id.,* 804 F.2d at 12.

The Court finds that there was no anticipatory breach of contract with respect to the August 13, 2010 closing date but BMC did default on the Amended BMC APA after the August 17 Hearing. BMC did not close on the sale. However, there are issues of material fact as to whether the Debtors sustained any damages.

*I.  Whether There was Anticipatory Breach by BMC with respect to the August 13, 2010 Closing.*

The Amended BMC APA is governed by New York law. "Under New York Law, a party to a contract commits an anticipatory breach of the contract when prior to the time set for performance under the contract, it declares expressly or by its conduct that it will not perform its part of the bargain. *In re Food Management Group, LLC*, 372 B.R. 171, 189 (S.D.N.Y. Bankr. 2007)(citing *In re Asia Global Crossing, Ltd.*, 326 B.R. 240, 249 (Bankr. S.D.N.Y. 2005), *adhered to in part on reorg.,* 332 B.R. 520 (Bankr. S.D.N.Y. 2005)). The party alleged to have committed the repudiation must declare expressly or by its conduct that it will not perform its part of the bargain <u>ahead</u> or <u>prior</u> to the time set for performance.

In this case, while closing did not take place on August 13, 2010 as initially scheduled, there does not appear to be any express statement or any conduct prior to the August 13, 2010 closing date that BMC would not perform under the Amended BMC APA. Even as late as the August 17 Hearing before the Court on the Debtors' motion to extend the use of cash collateral beyond August 15, 2010 and for clarification of the Court's August 11 Order, there was no

11

indication that BMC would not be closing the sale of the Debtors' assets. Indeed, the August 13, 2010 closing date was extended to accommodate and address BMC's concerns regarding Paragraph 41 of the Court's August 11 Order at the August 17 Hearing. Accordingly, there was no anticipatory repudiation simply because BMC did not appear at the initial closing scheduled for August 13, 2010 nor were there any acts or statements of anticipatory repudiation by BMC leading up to or at the August 17 Hearing.

*II. Whether BMC defaulted on the Amended APA after the August 17 Hearing.*

However, the Court finds that BMC defaulted on the Amended BMC APA after the August 17 Hearing by (a) breaching its representation under Section 7.4 of the Amended BMC APA that it has sufficient funds available to consummate the transactions and (b) failing to close on the sale of the Debtors' assets by August 20, 2010.

"Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Holdings, Inc. v. Biderman*, 21 F.3d 522, 525 (2d Cir. 1994).

At the August 17 Hearing, it was anticipated that closing on the Amended BMC APA would take place no later than August 20, 2010 as the Court had only extended the Debtors' use of cash collateral to the August 20thdate. There was no indication at the August 17 Hearing that either the Debtors or BMC would not be ready to close on the Amended BMC APA. Yet, the closing on the Amended BMC APA did not occur. Rather, on or about August 18, 2010, BMC lost its financing commitment from Guggenheim. BMC argues that from August 17, 2010 to September 3, 2010, it was attempting to secure backup financing from Prospect Capital Management LLC to acquire the Debtors' assets and work toward closing. BMC presented an

email dated August 19, 2010 from a managing director at Prospect Capital Management LLC to

Joel Dempsey that contained a non-binding summary or proposed terms and conditions dated

August 17, 2010 for purchase of the Debtors' assets in the amount of $18,000,000. The proposed

terms and conditions from Prospect Capital Management LLC were not a commitment.

Notwithstanding BMC's attempts to secure backup financing, Section 7.4 of the

Amended BMC APA specified that there is no financing contingency with respect to the buyer's

obligations. BMC was obligated to close but there is no evidence that BMC was ready or able to

close after Guggenheim withdrew its financing commitment. Accordingly, when BMC failed to

close by August 20, 2010, it had breached its representation in Section 7.4 of the Amended

BMC APA because it did not have sufficient funds to consummate the purchase of the Debtors'

assets under the agreement without financing from a third party.

While BMC argues that there was no official termination of the Amended BMC APA and

that the Debtors were obligated to work with BMC to satisfy all conditions to closing, BMC

knew from the August 17 Hearing that the Debtors could not extend the closing date beyond

August 20, 2010 without providing some justification to the Court, PNC, and the Debtors'

creditors. As set forth in Paragraph DD of the Court's August 11 Order:

> To maximize the value of the Purchased Assets and preserve the viability of the
> business to which the Purchased Assets relate, it is essential that the Sale of the
> Purchased Assets occur within the time constrains set forth in the APA. Time is of
> the essence in consummating the sale.

BMC was aware that the sale needed to close by August 20, 2010 given that the Debtors'

authorization to use cash collateral would expire by that date. Indeed, the Debtors' obligations

under the Debtor in Possession facility with PNC had already matured and became due and

payable on July 30, 2010. The Court continued and extended the Debtors' use of cash collateral

13

on a limited short term basis after July 30, 2010. At the August 17 Hearing, PNC stated on the record that it would like the sale to BMC to close as quickly as possible and if not, then PNC would expect the Debtors to move to the back up bid as early as the following week. PNC did not offer to extend the use of cash collateral. Therefore, time was of the essence in closing on the Auction Sale and the Debtors did not have the luxury of waiting for BMC to secure back up financing. The Debtors also did not abandon BMC because they turned to PNC and ISIS only after they had already been notified that BMC lost its financing commitment from Guggenheim and it was clear that BMC was unable to close on or before August 20, 2010.

Furthermore, BMC's ability to secure backup financing in a timely manner given the Debtors' limited ability to use cash collateral was speculative. As indicated by BMC, it was still attempting to secure financing when the Court held a hearing on September 2, 2010 for approval of the sale of the Debtors' assets to PNC and ISIS. BMC did not file any motion with the Court during the period after the August 17 Hearing to seek an extension of time from the Court to close and did not file any objection with the Court to the Debtors' proposed sale to Ohio Community Media and ISIS. BMC did not file any motion requesting the Court to reconsider its approval of the sale to those third parties on the basis that it was entitled and ready to close. Given such facts and circumstances and BMC's breach of its no financial contingency representation contained in  Section 7.4 of the Amended BMC APA, the Debtors were not obligated to work with BMC to delay the closing date beyond August 20, 2010 prior to turning to the next successful bidder.

While BMC raised various affirmative defenses as to why it was not in default of the Amended BMC APA, the Court finds those arguments do not change the fact that BMC failed to

close after the August 17 Hearing. BMC argued that the failure of the Amended BMC APA to include the sale of the Xenia Property was problematic because of the alleged concentration of company assets housed there. BMC knew at the end of the Sale Hearing on July 29, 2010 that the Real Properties were not to be included in the Amended BMC APA. If BMC required that a lease of the Xenia Property be negotiated prior to closing, it should have insisted the lease be included as a condition to the Amended BMC APA or sought additional time to work out the lease prior to executing the Amended BMC APA on August 6, 2010. In addition, BMC has not shown how the failure to reach a lease agreement with respect to the Xenia Property prior to closing would hinder BMC's ability to close. Accordingly, BMC's inability to obtain a lease prior to closing is not a valid defense to BMC's failure to close by August 20, 2010.

BMC also argued that it was the Debtors and not BMC who was not ready to close and thus in default of the Amended BMC APA because certain of alleged discrepancies in a July 28 asset schedule (the "July 28 Asset Schedule") and other schedules to the Amended BMC APA that were incorrect and never addressed by Debtors' counsel. In particular, the Debtors had listed in the July 28 Asset Schedule assets for "Ft. Collins: and "Lakewood" which referred to the location of the North Colorado Business Reports and a database company, DataJoe. Which the Debtors did not own but did have a controlling interest. The July 28 Asset Schedule also included acreage in Athens, Ohio that the Debtors had sold in 2007 and other real property that the Debtors did not own.  The July 28 Asset Schedule did not list any press assets for the Tipp Print Plant where the Debtor had press lines.

Generally, if BMC had concerns about the assets being transferred or liabilities being assumed pursuant to the Amended BMC APA and the July 28 Asset Schedule, it should have

15

raised them prior to executing the Amended BMC APA on August 6, 2010. Most of the assets listed in the Amended BMC APA were the same as those listed in the May 4 APA with the exception of the assets being sold to Delphos and the Real Properties. The language in the Amended BMC APA is inclusive of assets listed in Schedule 2.1.8, not exclusive. Overall, discrepancies in the schedules to the Amended BMC APA should not have been difficult to resolve as they were matters confirming what assets and values were in the Debtors' books and records as of closing and there was no reason why a post-closing reserve could not be established if there needed to be adjustments on the final figures. A review of email communications provided by BMC on this issue show that communications regarding these alleged discrepancies were exchanged on or before August 13, 2010 but there is no evidence that these discrepancies were still an issue or a barrier to closing after the August 17 Hearing. BMC's counsel did not raise any specific concerns regarding the discrepancies in the schedules or the Amended BMC APA that needed to be resolved at the August 17 Hearing nor did counsel assert that the Debtors were not ready to close because of these discrepancies.

To the extent there is a concern that the Amended BMC APA transferred more than what the Debtors had because of any inaccuracies listed in the July 28 Asset Schedule, Paragraph 41 of the Court's August 11 Order provides that the sale pertains only to assets the Debtors actually own and disclosed in the bankruptcy schedules and in the Amended BMC APA. If the Debtors did not own these assets, then they cannot transfer ownership of these assets. Moreover, because the officers of BMC were also Insiders of the Debtors, they were in the best position to know whether any of the assets listed in any of the schedules did or did not belong to the Debtors. Thus, any such discrepancies should have been easily resolved. Accordingly, there could be no

reliance by BMC upon these discrepancies in these schedules nor should these discrepancies have been a consideration of BMC's purchase price when it placed its bid at the Auction Sale. Whatever concerns BMC had regarding Paragraph 41 to the August 11 Order and the adequacy of the description of the "Purchased Assets", the Court addressed them at the August 17 Hearing. If BMC was not satisfied with the answers given, then the time to make it known should have been at the hearing by requesting further clarification or modification of the August 11 Order, or a further extension of time to work out whatever remaining issues or agreement on language would be satisfactory to all parties in interest, or even by appeal of the August 11 Order. Yet, BMC took none of those actions at the time and it cannot now assert that the August 11 Order was still not in a form and content reasonably satisfactory to it.

In addition, BMC raises in its Cross-Motion that Paragraph 41 of the August 11 Order created a direct contradiction with Paragraphs 5 and 7 of the same order which authorizes the Debtors to consummate the sale and transfer the Purchased Assets to BMC. The Court finds no such contradiction or inconsistency as the term "Purchased Assets" is defined and disclosed in the Amended BMC APA. The same language in Paragraphs 5, 7 and 41 of the August 11 Order appears also in the Court's Order approving the sale of assets to Delphos dated August 11, 2010, and in the Court's Orders dated September 3, 2010 approving the sale to Ohio Community Media and ISIS, and those sales closed without any of the buyers raising any issue with the Court that such language hindered closing.

Based upon the foregoing, the Court finds that BMC's failure to close on the sale by August 20, 2010 constituted an actual default of the Amended BMC APA to purchase the Debtors' assets.

III.     *Issue of Damages.*

A cause of action for breach of contract requires a finding of damages.

The Trust alleges, without any specifics, that the Debtors sustained damages as a result of BMC's breach.  It argued that under *Maxton Builders Inc. v. LoGalbo et al.*, 68 N.Y.2d 373 (N.Y. 1986), the Trust, as the non-breaching party, is always entitled to the retention of the good faith deposit. In *Maxton Builders*, the Court of Appeals of New York upheld the rule of *Lawrence v. Miller*, 86 N.Y. 131 (N.Y. 1881) which permits the seller on a real estate contract to retain the down payment when the purchaser wilfully defaults.

The Court notes, however, that *Maxton Builders* involved a breach of contract with respect to a real estate purchase while the case before this Court deals with a sale of ongoing businesses. A rule that a seller is entitled to retain a deposit in real estate transactions when the buyer defaults cannot be blindly applied to non-real estate contracts without an examination of the relevant contract at issue. In the context of a real estate transaction, the amount of actual damages or net benefit conferred upon a seller as a result of a breach by the buyer and subsequent sale by the seller may be difficult to determine depending upon the real estate market, the seller's personal situation and the costs that may be incurred in remarketing the property and delaying the sale. A liquidated damages provision may be a practical estimate of the amount of actual damages in these situations. In the context of an auction sale, as in the case before this Court, parties participate knowing that they would be bound by their bids. There is generally a successful bidder and next successful bidder and the amount of their bids are known. While it is not often that the successful bidder fails to close, when this does occur, the next successful bidder is in place for closing to occur quickly without the need for further marketing

18

of the assets and uncertainty on the part of the seller.  Even rarer is a scenario where the ultimate

purchase price from the next successful bidder would be greater than that of the original

successful bid. Nevertheless, the difference between the original successful bid and the final

purchase price is capable of a determination as to value whereas that may not be the case in a

real estate transaction.

Even in real estate contracts, the court in *Maxton Builders* held that whether the buyer is

able to recover the deposit depends upon whether there is a liquidated damages provision under

the contract.

> In cases, as here, where the property is sold to another after the breach, the
> buyer's ability to recover the down payment would depend initially on whether
> the agreement expressly provides that the seller could retain it upon default. If it
> did the provision would probably be upheld as a valid liquidated damages clause
> in view of the recognized difficulty of estimating actual damages and the general
> acceptance of the traditional 10% down payment as a reasonable amount.

> If the contract itself is deemed to pose no bar, then the buyer would bear the
> burden of proving that the amount retained exceeded the actual damages. As the
> authorities note, this is a difficult burden in any case involving real estate sales,
> and is not likely to be met in suits on down payments or first installments where
> the actual damages will generally be very close to the amount of the traditional
> 10% retained.

*Maxton Builders, Inc.*, 68 N.Y.2d at 382.  In *Maxton Builders*, there was no reference to whether

a liquidated damages provision existed in the contract but the court found that the breaching

party made no effort to show that the actual damages were less than what the seller alleged or

that there was in fact a net benefit conferred to the seller. There, the seller had resold the real

property to another purchaser but allegedly incurred a broker's commission and some financial

losses and carrying costs as a result of the breach. Accordingly, the court affirmed the lower

court's decision to award the deposit to the seller.

Here, the Court looks to whether the damages provision with respect to the good faith deposit constitutes a liquidated damages provision and, if not, whether the Debtors sustained any damages that would entitle the Trust to retain a part or the entire amount of the deposit. Liquidated damages provisions in agreements are closely scrutinized by the courts.

> While provisions for liquidated damages in a contract are valid, a stipulation for damages which is actually in the nature of a penalty is contrary to public policy and will not be enforced in the absence of statute. The important question is whether the stipulation for payment of a statement amount in event of a default is intended as security for performance of the contact or is an attempt to estimate and fix in advance the measure of compensation for its breach.

36 N.Y. Jur. Damages §162.

The Amended BMC APA and the Court's August 11 Order are devoid of any provision for damages with respect to the good faith deposit. Rather, the reference to damages concerning good faith deposit is contained in Section M of the Sale Procedures annexed to the Court's Sale Procedures Order. Section M provides that if the successful purchaser fails to close the Sale, the successful purchaser's good faith deposit "shall be retained by the Debtors on accounts (sic) of damages suffered by it as a result of such failure to close, without prejudice to the Debtors' ability to seek to recover additional damages". The Trust argues that Section M should be construed as a liquidated damages provision with respect to the Amended BMC APA and that the Trust should be entitled to retain the $760,000 deposit as a result of BMC's failure to close on the sale.

> Where a contract contains a liquidated damages provision:
>
> "[d]epending on what is commanded by the contract, numerous variables may be relevant in determining how and to whom a liquidated damages clause should be applied. Contracts are instruments of infinite refinement, capable of providing for virtually anything the parties agree to, and the fact that one party to a contract has agreed that damages in certain circumstances should be liquidated does not

20

> necessarily mean that all parties have agreed to such a limitation. Contracts
> sometimes provide for a different measure of damages depending on which party
> is in breach.

*Aircraft Services Resales LLC v. Oceanic Capital Company Ltd.,* No. 1-3469-cv, 2012 U.S. App.

LEXIS 17390, *5-6 (2d Cir. Aug. 16, 2012). Where a contract contains both a liquidated

damages provision and an actual damages provision, the liquidated damages provision is read

out of the contract. *Food Management Group, LLC et al. v. Matrix Realty Group, Inc. (In re*

*Food Management Group, LLC)*, No., 05-08626 (ASH), 2007 Bankr. LEXIS 4193, *5 (Bankr.

S.D.N.Y. Dec. 10, 2007).

Section M does not fix or limit the amount of damages the Debtors may seek to recover

should the successful purchaser be unable to close on the Sale. Rather, Section M permits the

Debtors to seek damages in addition to the good faith deposit. In order to be able to seek

additional damages, there would need to be a showing that the Debtors suffered damages greater

than the amount of the good faith deposit; thus, in essence, the damages provision in Schedule M

is an actual damages provision because it does not limit damages to just the good faith deposit.

The fact that the Debtors have not pursued damages greater than the amount of the good faith

deposit in this case is inapposite as to whether a liquidated damages provision exists.  Where

there is no limit or fixed amount of damages stated in advance on what the non-breaching party

may recover for breach of contract, then there cannot be a liquidated damages provision. *Food*

*Management Group, LLC,* 2007 Bankr. LEXIS 4193, *7-15 (finding that a contract for the sale

of all of the debtors' assets did not contain a liquidated damages provision where contract

provides that upon the purchaser's breach, the debtors were entitled to retain the bidding deposit

without limiting the debtors' right to seek recovery of actual or additional damages).  See also

*Nelson v. Landesman*, 118 Misc. 832, 193 N.Y.S. 574 (N.Y. Mun. Ct. 1921)(in a case dealing with the purchase of a defendant's business, stating that if money has been paid as a guaranty of a plaintiff's good faith, then the plaintiff would have the right to recover the deposit subject to damages to be proven by the defendant but if the money was paid as part of the purchase price, then the defendant is entitled to retain the whole, not merely his actual damages).

Here, the funds at issue were provided to the Debtors as a good faith deposit as was required of all bidders to the Auction Sale. While there is a limited number of cases that provide that a deposit in the nature of part payment on a contract is nonrefundable to a breaching party, *European School of Economics Founding et al. v. Teknoloji Holdings A.S.*, 08 Civ. 2235 (TPG), 2011 U.S. Dist LEXIS 47691 (S.D.N.Y. May 4, 2011), *Nelson v. Landesman*, 118 Misc. 832, the deposit in this case is not a partial payment or an up-front payment on a contract but rather a deposit to secure performance on the contract. BMC, like the other qualified bidders at the Auction Sale, was required to make such a deposit in order to participate in the Auction Sale and the deposit was returnable should the qualified bidder fail to be the successful bidder or next successful bidder. Accordingly, the deposit given by BMC was not in the nature of part performance of a contract and those cases are inapplicable.

Where there is no liquidated contract provision, then the non-breaching party is entitled to actual damages.

> It is a well -settled principle of black letter contract law that absent a contract provision to the contrary, the damages that may be recovered by a non-breaching party are the actual damages suffered by that party. The restitution is 'intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed.

*Food Management Group, LLC*, 2007 Bankr. LEXIS 4193, *5 (internal citations omitted).

The Trust argues that a finding that it is only entitled to actual damages and not liquidated damages would result in the opening of a flood gate in sales under section 363 of the Bankruptcy Code of successful bidders who may seek to renege on their contracts or bids and argue for the retention of their good faith deposit at the expense of the estate. However, as noted above, in the context of an auction sale, the instances of the next successful bidder ultimately paying a greater purchase price than the first successful bidder where there are no actual damages is extremely rare.  Moreover, as the Court of Appeals of New York concluded in *Maxton Builders*, "[e]xcept in cases where there is a real risk of overreaching, there should be no need for the courts to relieve the parties of the consequences of their contract. If the parties are dissatisfied with the rule of *Lawrence v Miller* (supra), the time to say so is at the bargaining table." *Maxton Builders*, 68 N.Y.2d at 382.  Thus, if sellers at a section 363 sale want to have a liquidated damages provision, they should be clear and up-front about such a provision and limit themselves only to the fixed amount or percentage of such damages without providing for the ability to also seek actual damages if the actual damages exceed the fixed amount or percentage. Potential bidders or buyers who participate in such sales knowing that the good faith deposit would be forfeited as liquidated damages should they, as the successful bidder or purchaser, fail to close would expect to be bound by the terms of the sale and/or contract. Accordingly, the Trust's argument of the potential for opening a flood gate scenario is misplaced in this context.

In determining whether the Debtors suffered actual damages, the Court notes that the auction purchase price by BMC under the Amended BMC APA was for $22,410,000 plus the assumption of certain liabilities under the Amended BMC APA. The sale to PNC/Ohio Community Media and ISIS Ventures for the same assets generated a total of $23,500,000

($21,750,000 to PNC and $1,750,000 to ISIS), plus cure amounts and the assumption of liabilities. On its face, it appears that the Debtors' subsequent sale to PNC and ISIS generated a higher aggregate purchase price than if the sale to BMC were to close.

The value of the assumed liabilities and any cure amounts not already provided for under the Amended BMC APA with BMC and the contracts of sale to PNC and ISIS are unknown. The Trust merely alleges the Debtors have been damaged. No evidence has been provided by the Trust as to the actual amount of damages allegedly sustained by the Debtors. As the determination of the actual amount of damages is an issue of material fact, summary judgment cannot be granted with respect to the Trust's action for breach of contract. Similarly, summary judgment on the issue of which party is entitled to retain the good faith deposit and as to BMC's counterclaims are not appropriate at this time.

<u>CONCLUSION</u>

Based upon the foregoing, the Court finds that BMC breached the contract with the Debtors by failing to timely close on the sale of the Debtor's assets on or before August 20, 2010. There is no liquidated damages clause in the contract. However, whether the Debtors sustained actual damages is an issue of material fact that prohibits a determination on summary judgment as to which party is entitled to the good faith deposit.

Accordingly, the Trust's Summary Judgment Motion and BMC's Cross Motion are

denied.

       So Ordered.



**Dated: Central Islip, New York**
      **January 22, 2013**

25

**Dorothy Eisenberg**
**United States Bankruptcy Judge**